**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>APPROXIMATELY 95,010.397318 USDT,<br><br>Defendants, *in rem,* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **COMPLAINT FOR FORFEITURE *IN REM***<br><br>***CIVIL ACTION NO.***<br>**26-cv-2276** |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against approximately 95,010.397318 USDT, collectively hereinafter referred to as the Defendant Property, and alleges as follows:

**STATEMENT OF THE CASE**

1. Criminals abroad, their associates, and conspirators together stole funds through a cryptocurrency investment scheme, which is sometimes referred to as "pig butchering.' The perpetrators befriended the victim, tricked them into a fraudulent investment scheme, and attempted to launder the proceeds through a convoluted web of cryptocurrency wallets to evade detection and obfuscate accountability. The Federal Bureau of Investigation ("FBI") Washington Field Office, intercepted the Defendant Property, which constitutes proceeds traceable to the theft and property involved in, and traceable to, this nefarious investment fraud scheme.

2. The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through

illegal activities; to promote and enhance cooperation among federal and foreign law enforcement agencies; and most importantly, to recover assets that may be used to compensate victims.[1]

## JURISDICTION AND VENUE

3. This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4. This Court has *in rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b).

5. Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(2) because the property is subject to forfeiture under the laws of the United States and is controlled by Tether International S.A. de C.V. ("Tether"), which is domiciled in the country of El Salvador.

## NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE

6. The United States files this *in rem* forfeiture action to seek forfeiture of Defendant Property as constituting proceeds of wire fraud, money laundering, and related conspiracy offenses, committed in violation of 18 U.S.C. §§ 1343 (wire fraud), 1349 (wire fraud conspiracy, 1956(a)(1)(B)(i) (concealment money laundering), 1956(h) (money laundering conspiracy).

7. Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

### A. Case Related Violations

8. **Title 18 U.S.C. § 1343** provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, commits the violation of wire fraud.

9. **Title 18 U.S.C. § 1349** provides that whoever attempts or conspires to commit a violation of 18 U.S.C. § 1343 shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

10. **Title 18 U.S.C. § 1956(a)(1)(B)(i)** provides in relevant part that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty concealment money laundering.

11. **Title 18 U.S.C. § 1956(h)** provides that any person who conspires to commit any offense of 1956 or 1957 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

B. Case Related Forfeiture Authorities

12. **Title 18 U.S.C. § 981(a)(1)(A)** mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.

13. **Title 18 U.S.C. § 981(a)(1)(C)** mandates forfeiture of property constituting or derived from proceeds traceable to wire fraud, conspiracy to commit wire fraud, or any offense constituting "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense. A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense,

constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

## PROPERTY INFORMATION

14. The Defendant Funds were seized from three Tether addresses TX1nhYx2vw9Hn9qNDvJAR6hCZptBbYwjpL (SUBJECT ADDRESS 1), TPFsKRMuVDkzay7wLrFoN5tP37V8Bdsbye (SUBJECT ADDRESS 2) and 0x4f87F64D1914c7032e4b40368B89B6c61E91a71C (SUBJECT ADDRESS 3). Collectively, the currency together is hereinafter referred to as the "Defendant Property," and the addresses together are hereinafter referred to as "SUBJECT ADDRESSES." The funds currently contained within the SUBJECT ADDRESSES consist of 25,000.08002 USDT held in SUBJECT ADDRESS 1, 30,000 USDT held in SUBJECT ADDRESS 2, and 40,010.317298 USDT held in SUBJECT ADDRESS 3. These funds have been traced via direct or circumstantial evidence, to wire fraud and money laundering. In total as of June 17th, 2026, the funds contained in the SUBJECT ADDRESSES are valued at approximately $94,918.12 in United States currency. While USDT is pegged to the US Dollar, the spot value of Tether can change on a day-to-day basis, where the value of 1 USDT may range a few cents on either side of $1.00.

15. The Defendant Funds are not in government custody and are instead held by Tether. Upon the issuance of a warrant in rem, the Defendant funds will be transferred to the custody of the United States.

## DEFINITIONS

16. **Virtual Currency:** Virtual currencies are digital tokens of value circulated over the internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but are generated and

controlled through computer software. Bitcoin ("BTC") and Ether ("ETH") are currently the most well-known virtual currencies in use.

17. **Stablecoins:** Stablecoins are a type of virtual currency designed to maintain a stable value relative to another asset, typically a unit of currency or commodity or basket of assets. USDT, commonly referred to as a stablecoin, is pegged to the value of the U.S. dollar, and one USDT is intended to be valued at $1. Tether Limited is the token manager (the owner of the smart contract) and the entity responsible for keeping funds in reserve that back USDT. Tether Limited Inc. is owned by iFinex Inc., a company registered in the British Virgin Islands and reportedly headquartered in Hong Kong.

18. **Virtual Currency Address:** Virtual currency addresses are the specific virtual locations to or from which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

19. **Private Key:** Each virtual currency address is controlled through a unique corresponding private key, a cryptographic equivalent of a password needed to access the address. Only the holder(s) of an address's private key can authorize a transfer of virtual currency from that address to another address.

20. **Virtual Currency Wallet:** There are various types of virtual currency wallets, including software wallets, hardware wallets, paper wallets. A software wallet is a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys. A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

21. **Hosted Wallets:** Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

22. **Blockchain:** The code behind many virtual currencies requires that all transactions involving that virtual currency be publicly recorded on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by a decentralized network of computers and using that blockchain's technology, containing an immutable and historical record of every transaction. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

23. **Blockchain Explorers:** Online tools that operate as a blockchain search engine. Blockchain explorers enable users to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses API and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

24. **Gas Fees:** Transfers of cryptocurrencies are subject to transaction costs known as "gas fees." Each blockchain maintains its own manner of paying those costs that is specific to that individual blockchain. When making an exchange, users pay this fee to third parties, called miners, who engage with the Ethereum ecosystem to support the transfer of cryptocurrency worldwide. A simplified analogy is mailing a letter through the U.S. Mail. The postage cost is like the Gas fee in Ethereum. Just as an individual must pay the postage to send a letter, an individual transacting on

the Ethereum network must pay a Gas fee. Moreover, given that a letter is sent using postage that a sender commonly pays for, the postage can be presumed to be sent or associated with the mailer. The same logic holds in cryptocurrency transactions, where transferors typically pay fees associated with transfers. With Gas fees, however, the postage is more like a digital fingerprint, in that it cannot be changed or manipulated in any way.

25. **Virtual Currency:** Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

26. **Blockchain:** A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of

blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

27. **Blockchain Analysis:** Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

28. **Virtual Currency Address:** A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

29. **Virtual Currency Exchange:** A virtual currency exchange ("VCE"), also called a virtual currency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

30. **Virtual Currency Wallet:** A virtual currency wallet (*e.g.,* a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

31. **Unhosted Wallet:** An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (*e.g.,* a virtual currency exchange) to facilitate a transaction involving the wallet. Unhosted wallets allow users to generate and manage their own unhosted wallet addresses.

32. **Transaction Fee:** A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (*e.g.*, Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

33. **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, Tether (also known as USDT) is a stablecoin pegged to the U.S. dollar.

Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

34. **Tether:** Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

35. **USDT**: A virtual currency also known as Tether that resides on multiple blockchains. The value of USDT is tied to the value of the U.S. dollar. Thus, one unit of USDT is represented to be backed by one U.S. dollar in Tether's reserves, making it what is known as a "stablecoin." USDT is issued by Tether International S.A. de C.V. USDT is hosted on the Ethereum and Tron blockchains, among others.

36. **Ethereum (ETH):** A cryptocurrency that is open-source and is distributed on a platform that uses "smart contract" technology. Transactions involving ETH are publicly recorded on the Ethereum blockchain, which allows anyone to track the movement of ETH.

37. **Virtual currency exchanges (VCEs):** Trading and/or storage platforms for virtual currencies such as BTC and ETH. Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (*i.e.*, "know your customer" or "KYC" checks) and to have anti-money laundering programs in place.

38. **Blockchain Analysis:** It is virtually impossible to look at a single transaction on a blockchain and immediately ascertain the identity of the individual behind the transaction. That is because blockchain data generally consist only of alphanumeric strings and timestamps. But law enforcement can obtain leads regarding the identity of the owner of an address by analyzing blockchain data to figure out whether that same individual is connected to other relevant addresses

on the blockchain. To analyze blockchain data, law enforcement can use blockchain explorers as well as commercial services offered by several different blockchain-analysis companies. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

## OVERVIEW OF CONFIDENCE SCAMS

39. Cryptocurrency investment fraud ("CIF") schemes like the one described in this Complaint are colloquially referred to as "pig-butchering." CIF schemes are often orchestrated by Asia-based criminal syndicates, predominately operating in southeast Asia. That term is derived from the Chinese-language word used to describe this scheme and its treatment of victims; the Asia-based criminal syndicates view American victims as pigs to be fattened and slaughtered. In 2024 alone, more than 41,000 complaints of CIF were received by the FBI's Internet Crime Complaint Center (IC3), resulting in $5.8 billion in reported losses.[2]

40. CIF schemes begin by criminals contacting potential victims through seemingly misdirected text messages, dating applications, or professional meetup groups. Next, using various means of manipulation, the criminal gains the victim's trust and affection.

41. Once that trust is established, the perpetrator recommends certain cryptocurrency investments by touting their own, or an associate's, success in the field. Means of carrying out the scheme vary, but a common tactic is to direct a victim to a fake investment platform hosted on a website. These websites, and the investment platforms hosted there, are created by criminals to mimic legitimate platforms. The criminal assists the victim with opening a cryptocurrency account,

[2] *See* Fed. Bureau of Investigation, Internet Crime Report 2024 at 36, https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

often on an exchange such as Binance or Coinbase, then walks the victim through transferring money from a bank account to that cryptocurrency account. Next, the victim will receive instructions on how to transfer their cryptocurrency assets to the fake investment platform. On its surface, the platform shows lucrative returns, encouraging further investment; underneath, all deposited funds are routed to a cryptocurrency wallet address controlled completely by the criminals.

42. CIF perpetrators frequently allow victims to withdraw some of their "profits" early in the scheme to engender trust and help convince victims of the legitimacy of the platform. As the scheme continues, victims are unable to withdraw their funds and are provided various excuses as to why. For example, the criminals will often levy a fake "tax" requirement, by stating that taxes must be paid on the proceeds generated from the platform. Sometimes the perpetrators will create a sense of panic or desperation in the victims so that they continue to invest and pay fees. But this is just an eleventh-hour effort by the criminals to elicit more money from victims. The criminals then typically lock the victims out of their "accounts" on the platforms and the victims lose access to their funds and sever all contact.

43. The criminals then move the victim funds beyond the reach of law enforcement, typically by using non-custodial or "private" wallets that law enforcement cannot attribute using legal process or blockchain analysis alone; by transferring victim funds through multiple wallets before those funds reach a consolidation wallet; and by commingling victim funds with other funds in a consolidation wallet and sometimes then further transferring the funds to additional "downstream" wallets. Criminals frequently liquidate their cryptocurrency fraud proceeds by using

"brokers" who agree to buy the cryptocurrency in exchange for other currency, including fiat currency.[3]

44. In 2020—prior to the emergence of these types of scams—confidence schemes, or romance scams, were reported to have cost U.S. victims over $600 million dollars in losses. This represented a $125 million dollar increase from 2019, and $238 million dollars from 2018, for a total of $1.43 billion dollars in losses attributed to confidence schemes from 2018–2020. Separately, during this same time-period, investment scams were reported to have cost U.S. victims over $800 million dollars.[4]

45. Since the emergence of cryptocurrency-based confidence scams, those same scam categories have seen their losses multiply at significant levels, reaching a reported loss of over $5.22 billion dollars in 2023 alone for confidence schemes and investments scams combined.[5] And in 2024, that same loss increased to approximately $7 billion dollars.[6]

**FACTS GIVING RISE TO FORFEITURE**

46. On or about January 3, 2025, a victim residing in or around Houston, TX ("VICTIM 1") reported an alleged cryptocurrency investment fraud scam to the FBI. Starting in December 2024, VICTIM 1 followed a financial advisor's account on X (formerly Twitter) and sent a message to them requesting to subscribe to their paid financial advice feed. An individual purporting to be the

---

[3] Financial Crimes Enforcement Network, *FinCEN Alert on Prevalent Virtual Currency Investment Scam Commonly Known as "Pig Butchering"* (Sept. 8, 2023), https://www.fincen.gov/sites/default/files/shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.pdf.

[4] Internet Crime Complaint Center, Internet Crime Report 2020, https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf (last accessed 4/9/2025).

[5] Internet Crime Complaint Center, Internet Crime Report 2023, https://www.ic3.gov/Media/PDF/AnnualReport/2023_IC3Report.pdf (last accessed 4/9/2025).

[6] Internet Crime Complaint Center, Internet Crime Report 2024, https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf (last accessed 6/6/2025)

financial advisor ("SCAMMER") responded to VICTIM 1's message from an account similar in appearance to the financial advisor's. SCAMMER befriended VICTIM 1, sharing personal details about his daughter, a friend with cancer, and claiming to be a Christian. SCAMMER encouraged VICTIM 1 to start investing in cryptocurrency on the polytrades.com platform. SCAMMER suggested starting with $20,000 U.S. dollars (USD), so VICTIM 1 followed that advice and saw initial purported gains of $7,000-8,000 USD.

47. After these successful trades SCAMMER informed VICTIM 1 that there was an upcoming trading opportunity expected to yield a 400 percent return on investment based on advanced knowledge of anticipated price fluctuation in a crypto asset. SCAMMER explained that participation in the investment required a minimum of $200,000 USD. Since VICTIM 1 had already seen what he believed to be significant gains on his initial investment, he decided to deposit $210,000 USD into his exchange wallet at pollytrades.com. Following the trade VICTIM 1 saw his account grow to $1.97 million USDT. VICTIM 1 attempted to withdraw some of the funds but the pollytrades.com platform blocked any withdrawals pending payment for a "trading commission fee" of $340,000 USD. The "trading commission fee" was calculated as 20 percent of the $1.7 million USDT earned on the trade.

48. Pollytrades.com told VICTIM 1 that the fee could not be paid from the wallet on the platform, instead claiming that the fee be paid from an external account. Concerned by the request from pollytrades.com, VICTIM 1 reached out to the financial advisor on X (formerly Twitter) to ask about the "trading commission fee" and realized that the X account (formerly Twitter) that he had been corresponding with was slightly different from the original financial advisor's, yet, had the same profile picture and shared the same posts. VICTIM 1 asked the financial advisor from the original account if he used any alternate X accounts (formerly Twitter) to share financial advice and

the financial advisor stated that he did not, and that fake profiles are common on that platform. The SCAMMER has continued to reach out to VICTIM 1 about the investment and fee, encouraging VICTIM 1 to borrow from relatives, liquidate his 401k, or even refinance his home. SCAMMER then offered to pay $200,000 of the fee so VICTIM 1 would only have to pay $140,000 USD. SCAMMER gave no explanation as to why he would cover part of the fee. VICTIM 1 then contacted law enforcement.

49. Response from a subpoena served to Namecheap, a company that hosts the website pollytrades.com, returned information indicating that the address bc1q3h9y9pnah6rj6gp5vh9c8rt3pnddw0r4ruvh8u (the first cryptocurrency address that VICTIM 1 sends funds to) is connected to an account at Namecheap with the user ID pollytrades1, registered to an individual named "William Smalls" at a US based address, 4118 Post Farm Road, Atlanta, GA 30337. However, open-source searches revealed that this address does not exist. Further, the IP address used to first register this account at NameCheap resolves to Enugu, Nigeria, and the last known IP address used to access this NameCheap account resolves to Abakaliki, Nigeria.

50. The overall structure of the investment and fee requirement is consistent with the same or similar frequently used tactics by cryptocurrency investment fraud perpetrators. The scammers impersonated a legitimate financial advisor, faked a personal connection to build trust, tricked the victim into sending money, and attempted to take further advantage of VICTIM 1 after they requested to withdraw funds.

**Tracing Illicitly Obtained Funds to the SUBJECT ADDRESSES**

51. Investigators used blockchain analysis to trace VICTIM 1's fraudulent transactions. In total, VICTIM 1 conducted approximately 8 transactions over the course of the scheme. Of these, investigators focused on six of the transactions, which were identified and located. The funds were

ultimately laundered through cryptocurrency exchanges and deposited into one of three cryptocurrency addresses, collectively referred to as the SUBJECT ADDRESSES. Many of the transactions involving the fraudulent funds are done using the cryptocurrency Tether (USDT), a stablecoin. Throughout this section, any amount of USDT mentioned can be understood as being valued as the same as one US Dollar value (i.e., 1,000 USDT is equivalent to $1,000).

***SUBJECT ADDRESS 1***

52. SUBJECT ADDRESS 1 received proceeds traceable to VICTIM 1 as a result of six different transactions conducted by VICTIM 1. Each transaction is broken into its own subsection within the SUBJECT ADDRESS 1 section.

**Transaction 1**

53. On or about November 28, 2024, at around 17:51, VICTIM 1 sent approximately 0.19552394 BTC, valued at about $18,574.51, from their Kraken account to bc1q3h9y9pnah6rj6gp5vh9c8rt3pnddw0r4ruvh8u (bc1q3).

54. Hours later, on or about November 29, 2024, at around 00:01, bc1q3 sent approximately 0.1712698 BTC, valued at about $ 16,385.78, to bc1qvn5gnuwq0h38nrw39daj87a6qng4vrtvunh8tu (bc1qv). Again, hours later, on the same date at around 10:23, bc1qv then sent approximately 0.1712585 BTC, valued at about $16,509.03, to 12PdLbEkqLx7vyqQfPwB2SuX7jkcmZM8N7 (12Pd). Minutes later, at about 10:49, 12Pd then sent approximately 0.1712376 BTC, valued at about $16,507.017, to 3HEqCWrcNL64b1dCT6hD4kA3Gx5SuwHMr4 (3HEq). 3HEq is associated with Sideshift.ai, an instant cryptocurrency exchange. Law enforcement obtained records from Nexia.io/Sideshift.ai regarding this transaction which revealed that the 0.1712376 BTC was swapped for Ethereum, resulting in approximately 4.5156005 ETH, valued at about $16,122.60549, being transferred to

0x3c8560C49Da0345307057391e8dB4F2656217c33 (0x3c).

55. Minutes later, at around 10:53, 0x3c transferred 4.515411907465751 ETH, valued at about $16,121.93214, to 0x020A52DA12C61695af32085caD9A6BD4C5a83Bca (0x02). Within four minutes, 0x02 sent 4.510623920089203375 ETH, valued at about $16,104.83699, back to Nexia.io/Sideshift.ai.

56. Law enforcement again obtained records related to this transaction. The records indicate that the 4.510623920089203375 ETH was swapped for approximately 0.16254297 BTC, valued at about $15,745.12, which was then sent to 1EgY7YG9REduhqKP3XC2qbuZv2srtBsTT4 (1EgY).

57. A little more than one hour later, at around 12:33, 1EgY7 sent approximately 0.1253471 BTC, valued at about $12,193.68 to 3AKmJhinQLBnZtMtVtcbYVAqCeug3S5CLQ (3AKm). 3AKmJ is a Bitcoin address that is associated with an account held at the Cryptocurrency exchange MEXC.

58. Law Enforcement obtained records for the account associated with 3AKm at MEXC, which showed that 3AKm is an address associated with MEXC user ID 87255499, registered to email address papigabice@gmail.com (THE MEXC ACCOUNT). MEXC records did not provide a name, date of birth, or address for the account holder, however, login records show that every IP address used to log into the account resolves to the general area of Lagos, Nigeria.

59. Upon the receipt of the approximately 0.1253471 BTC, on or about November 29, 2024, at around 12:33, into THE MEXC ACCOUNT, the account initiated a spot trade of 0.1253471 BTC, valued at valued at about $12,193.68, for approximately 12,170.89 USDT. About one hour later, at around 13:23, THE MEXC ACCOUNT withdrew approximately 3,874 USDT and sent it to TWvjuAwsYCe31DfyrXaKFJFmphH1DnPqEp (TWvj), an address which is associated with an

account held at the Binance Cryptocurrency Exchange.

60. Law Enforcement obtained Binance account information for the account associated with TWyj. Binance records indicate that TWyj is associated with Binance Account 40375886 (THE BINANCE ACCOUNT), registered to Somtochukwu Samuel Ejindu, a Nigerian National, using email address ejinduama@gmail.com. IP Access Logs for the BINANCE ACCOUNT show log ins from locations almost exclusively in Nigeria, including Lagos, Abuja, Benin City, and Onitsha.

61. The approximately 3,874 USDT sent from the MEXC ACCOUNT to the BINANCE ACCOUNT on or about November 29, 2024, remained in the BINANCE ACCOUNT until around December 13, 2024.

62. Between November 29, 2024, and December 13, 2024, VICTIM 1 conducted further transactions related to the fraud scheme.

**Transaction 2**

63. On or about December 13, 2024, at about 04:21, VICTIM 1 sent approximately 0.44457413 BTC, valued at about $44,345.65, to bc1q3. Hours later, at around 12:01, bc1q3 sent 0.39853381 BTC, valued at around $40,003.13, to the MEXC ACCOUNT. Upon receipt in the MEXC ACCOUNT, a spot trade was conducted for the 0.39853381 BTC in return for 39,969.0952917335 USDT.

64. Following the spot trade, at around 12:38, the MEXC ACCOUNT sent approximately 11,219 USDT to the BINANCE ACCOUNT, where it was comingled with the approximately 3,874 USDT previously mentioned in Transaction 1, totaling approximately 15,093 USDT. Hours later on December 13, 2024, the BINANCE ACCOUNT conducted two withdrawals, totaling approximately 12,799 USDT, to address TTkUJHGrmXVY3roiWx1upTJHAagVYoRca2 (TTkU), the first, at around 15:40, of approximately 6,999 USDT, and the second, at around 15:48, for approximately

5,800 USDT. These funds, along with further funds sent by VICTIM 1, remained in TTkU between about December 13, 2024, and January 9, 2025.

65. In the intervening time period, VICTIM 1 sent further funds to the fraudulent investment platform which were eventually deposited into TTkU.

**Transaction 3**

66. On or about December 18, 2024, at around 01:45, VICTIM 1 sent approximately 0.69533766 BTC, valued at about $73,800.55, from their Kraken account to bc1q3. Hours later, at around 11:42, bc1q3 sent approximately 0.58894446 BTC, valued at around $61,557.29, to bc1qv. Again, minutes later, at around 12:39, bc1qv sent approximately 0.5545 BTC, valued at about $58,228.72, to the MEXC ACCOUNT. Upon receipt in the MEXC ACCOUNT, the MEXC ACCOUNT traded approximately 0.5545 BTC for approximately 58,132.998155 USDT.

67. On the same date, at around 13:01, the MEXC ACCOUNT sent approximately 16,877 USDT to TTkU. A few hours later, the MEXC account additionally sent approximately 30007.289296 USDT to 0x4f87F64D1914c7032e4b40368B89B6c61E91a71C (SUBJECT ADDRESS 3).

**Transaction 4**

68. On or about December 21, 2024, at around 04:41, VICTIM 1 sent approximately 29733.0846 USDT from their Kraken account to TUoK. Hours later, at around 21:46, TUoK sent approximately 25,500 USDT to TS6Y.

69. On or about December 22, 2024, at around 07:34, TS6Y sent approximately 19,500 USDT to the MEXC ACCOUNT. Hours later, on the same date, the MEXC ACCOUNT conducted two withdrawals containing the 19,500 USDT. At around 09:33, the first withdrawal of approximately 6,624 USDT was made and sent to the BINANCE ACCOUNT. Minutes later, at

around 09:38, an additional 12,000 USDT was sent to TPFsKRMuVDkzay7wLrFoN5tP37V8Bdsbye (SUBEJCT ADDRESS 2). The transaction to SUBJECT ADDRESS 2 will be revisited under the SUBJECT ADDRESS 2 section.

70. Following the receipt of the above-described transfer of 6,624 USDT from the MEXC ACCOUNT to the BINANCE ACCOUNT, the BINANCE ACCOUNT withdrew a portion of those funds the following day.

**Transaction 5**

71. On or about December 23, 2024, at around 13:01, the BINANCE ACCOUNT sent approximately 2,999 USDT to TTkU.

72. On or about December 23, 2024, at around 20:01, VICTIM 1 sent approximately 19,845.1622 USDT from their Kraken account to TUoK.

73. The following day, on or about December 24, 2024, at around 18:36, TUoK sent approximately 16,869 USDT to TS6Y. Hours later, at around 20:00, TS6Y sent approximately 12,900 to the MEXC ACCOUNT. Minutes later, at around 20:13, the MEXC ACCOUNT sent approximately 4,752 USDT to TTkU.

74. On or about December 25, 2024, at around 01:05, VICTIM 1 sent approximately 39,672.5394 USDT from their Kraken account to TUoK. Hours later, at around 18:28, TUoK sends approximately 33,719 USDT to TS6Y. Again, hours later, at around 20:25 TS6Y sends approximately 25,350 USDT to the MEXC ACCOUNT.

75. Minutes after receiving the above-described transfer, at around 20:48, the MEXC ACCOUNT sends approximately 9,614 USDT to TTkU. Following this transaction, at around 21:08, the MEXC ACCOUNT also sent approximately 15003.02 USDT to SUBJECT ADDRESS 3.

76. In total, as a result of the transactions described above, TTkU received approximately 47,041 USDT traceable to VICTIM 1. Prior to any deposits of funds traceable to VICTIM 1 into TTkU, TTkU held a USDT balance of approximately 49 USDT on or about December 13, 2024.

77. Between December 13, 2024 and January 9, 2025, aside from the six transactions containing VICTIM 1's funds, TTkU received no additional deposits. During the same period of time, TTkU made approximately 5 withdrawals totaling approximately 5,000 USDT. A LIBR analysis of TTkU shows that due to these withdrawals, the approximately 49 USDT held by TTkU was withdrawn, leaving TTkU's entire balance of approximately 41,090 USDT traceable to VICTIM 1.

78. On or about January 9, 2025, at around 16:48, TTkU sent approximately 35,000 USDT to TX1nhYx2vw9Hn9qNDvJAR6hCZptBbYwjpL (SUBJECT ADDRESS 1). Prior to this transaction, SUBJECT ADDRESS 1 had never made a transaction, and therefore held a balance of 0 USDT. On January 9, 2025, SUBJECT ADDRESS 1 held a balance of approximately 35,000 USDT.

79. Between around January 9, 2025, and about March 13, 2025, SUBJECT ADDRESS 1 received only two additional deposits, totaling approximately 0.08002 USDT. Between around January 9, 2025, and about April 26, 2025, SUBJECT ADDRESS 1 made around four withdrawals, totaling approximately 10,000 USDT. Following these transactions, SUBJECT ADDRESS 1 held a balance of approximately 25,000 USDT.

***SUBJECT ADDRESS 2***

80. As described above under Transaction 2, approximately 0.39853381 BTC was deposited into the MEXC ACCOUNT, which was then swapped for 39,969.0952917335 USDT. Following this swap, on or about December 13, 2024, at around 12:38, approximately 11,219 USDT

to the BINANCE ACCOUNT, leaving approximately 28,750.0952917335 USDT of traceable funds in the MEXC ACCOUNT.

81. On the same date, hours later, at around 21:23, the MEXC ACCOUNT sends approximately 20,000 USDT to TPFsKRMuVDkzay7wLrFoN5tP37V8Bdsbye (SUBJECT ADDRESS 2). Prior to the above-described transaction, SUBJECT ADDRESS 2 held a balance of approximately 4,500 USDT. Following this, the balance of SUBJECT ADDRESS 2 was brought to 24,500 USDT.

82. On or about December 21, 2024, at around 07:38, SUBJECT ADDRESS 2 sent approximately 1,000 USDT to an unrelated TRX address, leaving SUBJECT ADDRESS 2 with a balance of approximately 23,500 USDT.

83. As described under Transaction 4, on or about December 22, 2024, at around 07:34, 19,500 USDT of traceable funds were deposited into the MEXC ACCOUNT. Following this, approximately 12,000 USDT was sent to SUBJECT ADDRESS 2, bringing its balance to approximately 35,500 USDT. Following this, SUBJECT ADDRESS 2 received no additional deposits of USDT. However, between about February 28, 2025, and about April 4, 2025, SUBJECT ADDRESS 2 did conduct about 3 withdrawals of USDT, totaling approximately 5,500 USDT, leaving SUBJECT ADDRESS 2 with a balance of 30,000 USDT. A LIBR analysis of this address shows that while SUBJECT ADDRESS 2 held a balance of 4,500 USDT prior to the first deposit of VICTIM 1's funds, following that deposit, SUBJECT ADDRESS 2 completed 4 withdrawals, totaling 6,500 USDT, effectively depleting the 4,500 USDT balance held prior to the deposit of VICTIM 1's funds, leaving 30,000 USDT which is traceable to VICTIM 1.

***SUBJECT ADDRESS 3***

84. As described in Transaction 3, on or about December 18, 2024, at around 12:39, the

MEXC ACCOUNT received approximately 0.5545 BTC of funds traceable to VICTIM 1. The BTC was traded for approximately 58,132.998155 USDT. On the same date, at around 13:01, the MEXC ACCOUNT sent approximately 16,877 USDT to TTkU. A few hours later, the MEXC account additionally sent approximately 30,007.289296 USDT to 0x4f87F64D1914c7032e4b40368B89B6c61E91a71C (SUBJECT ADDRESS 3).

85. Prior to receiving the 30,007.289296 USDT, SUBJECT ADDRESS 3 held a balance of approximately 0 USDT. Upon receipt of the above-described transfer, SUBJECT ADDRESS 3 held a balance of approximately 30,007.289296 USDT.

86. As described in Transaction 6, on or about December 25, 2024, at around 20:25, the MEXC ACCOUNT received approximately 25,350 USDT of funds traceable to VICTIM 1.

87. Minutes after receiving the above-described transfer, at around 20:48, the MEXC ACCOUNT sends approximately 9,614 USDT to TTkU. Following this transaction, at around the MEXC ACCOUNT also sent approximately 15,003.02 USDT to SUBJECT ADDRESS 3.

88. SUBJECT ADDRESS 3 had made no additional transactions between the transactions described above, occurring between on or about December 18, 2024, and December 25, 2024. Therefore, upon receipt of the 15,003.02 USDT on or about December 25, 2024, SUBJECT ADDRESS 3's balance was brought to 45,010.3093 USDT. No further transactions were conducted until around March 7, 2025.

89. On or about March 7, 2025, at around 19:15, SUBJECT ADDRESS 3 sent approximately 5,000 USDT to an unrelated TRX address. This transaction brought the balance of SUBJECT ADDRESS 3 to approximately 40,010.3093 USDT, all of which is traceable to VICTIM 1.

90. The following chart depicts transfers from the fraudulent transaction to the SUBJECT

ADDRESSES:




## <u>FREEZING OF SUBJECT ADDRESSES 1-3</u>

91. On or about April 25, 2025, the FBI requested that Tether voluntarily freeze SUBJECT ADDRESS 1, SUBJECT ADDRESS 2, and SUBJECT ADDRESS 3. Tether responded the same date acknowledging receipt of the request. On or about April 28, 2025, Tether agreed to place a freeze on SUBJECT ADDRESS 1-3. On or about April 29, 2025, Tether confirmed that SUBJECT ADDRESS 1-3 were frozen.

92. At the time of freezing, the amounts frozen in the SUBJECT ADDRESSES were as follows:

a. SUBJECT ADDRESS 1: 25,000.08002 USDT

b. SUBJECT ADDRESS 2: 30,000 USDT

c. SUBJECT ADDRESS 3: 40,010.309296

93. On or about May 5, 2025, SUBJECT ADDRESS 3 received two additional deposits of 0.004001 each, bringing the current balance of SUBJECT ADDRESS 3 to 40,010.317298 USDT. No additional deposits have been made to SUBJECT ADDRESS 1 or 2. Therefore, the current

balances of the SUBJECT ADDRESSES are as follows:

a. SUBJECT ADDRESS 1: 25,000.08002 USDT

b. SUBJECT ADDRESS 2: 30,000 USDT

c. SUBJECT ADDRESS 3: 40,010.317298 USDT

**COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY**

**(18 U.S.C. § 981(a)(1)(A))**

94. The Defendant Property constitutes property involved concealment money laundering transactions committed in violation of Title 18, United States Code, §§ 1956(a)(1)(B)(i) and a conspiracy to engage in money laundering, committed in violation of Title 18, United States Code, § 1956(h).

95. Accordingly, the Defendant Funds are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

**COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY**

**(18 U.S.C. § 981(a)(1)(C))**

96. The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

97. Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

**PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why

the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

*/s/ Rick Blaylock, Jr.*
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765
rick.blaylock.jr@usdoj.gov

**VERIFICATION**

I, Michael Imbler, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 26th day of June, 2026.

Michael Imbler
Special Agent
Federal Bureau of Investigation